**THIRD DIVISION
ELLINGTON, P. J.,
DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 30, 2015**

# In the Court of Appeals of Georgia

A15A1423. BURDETTE v. CHANDLER TELECOM, LLC.

DILLARD, Judge.

Adrian Burdette, who was seriously injured after falling from a cell-phone tower while working for Chandler Telecom, LLC ("Chandler"), appeals the State Board of Workers' Compensation's (the "Board") decision to deny him benefits, which the superior court affirmed by operation of law. On appeal, Burdette argues that the Board erred in finding that his act of descending the tower by "controlled-descent,"[1] contrary to company policy, was "willful misconduct," which barred his recovery. He further contends that the administrative law judge ("ALJ"), who

---

[1] As explained more fully *infra*, controlled descent is similar to rappelling, and those terms are used interchangeably throughout the record.

presided over the hearing on his claim for benefits, erred in making several evidentiary rulings. For the reasons set forth *infra*, we reverse.

Viewing the evidence in a light most favorable to Chandler (*i.e.*, the prevailing party),[2] the record shows that Burdette[3] was initially employed by Chandler as a cell-tower technician on September 1, 2012, and he worked there for three weeks before taking a five-week leave of absence. Burdette was terminated during his leave of absence due to a miscommunication with his supervisor, but he was then rehired on November 2, 2012. During Burdette's leave of absence, Chandler required all of its cell-tower technicians to become ComTrain certified.[4] Upon his return, Burdette was asked if he was ComTrain certified, and he lied and said that he had this certification.[5]

---

[2] *See, e.g.*, *Atlas Auto., Inc. v. Wilson*, 225 Ga. App. 631, 633 (1) (484 SE2d 669) (1997).

[3] Throughout the record, Burdette is sometimes referred to as "Seith," his middle name.

[4] ComTrain is a third-party company that instructs cell-tower technicians to climb and descend cell-phone towers. Specifically, it trains technicians to use "controlled descent" when descending the towers. Controlled descent is similar to rappelling, except there is no "kick off" and the technicians must descend at a slow, safe, and controlled speed. According to a Chandler representative, controlled descent is used only when rescuing someone, and Chandler technicians are "always supposed to climb down."

[5] Burdette denies ever being asked whether he was ComTrain certified.

On November 5, 2012, Burdette's first day back at work, he was assigned to work on the top of a cell tower with Brian Prejean, who was the "lead tower hand" of the crew.[6] And prior to their shift that day, the supervisor over Burdette's six-person crew instructed them to climb down the towers and not to use controlled descent. Prejean and Burdette then worked together on the same cell tower from around 8:00 a.m. until 3:30 or 4:00 p.m. When their work was almost complete, Prejean instructed Burdette to climb down the tower, but Burdette responded that he wanted to use controlled descent instead.

Prejean's account of his conversation with Burdette just before Burdette's descent (and fall) is as follows:

> I told him no, man, just climb down. Might as well just climb down . . . . [W]e don't have a safety rope up here for you to grab. He told me he had done this so many times. I was like, dude, they're going to be mad if you do it. [Our supervisor] will be mad if you do it and, . . . you might not have a job or you might, you know, have to deal with the consequences if you don't listen . . . .

---

[6] The lead tower hand "leads the crew," "runs the top of the tower," and "tell[s] the people what to do up there."

Nevertheless, even after Prejean instructed Burdette to climb down the tower two or three more times, Burdette prepared his equipment and began controlled descent. Shortly thereafter, Burdette fell a great distance from the tower and landed on an "ice bridge," which caused serious injuries to his ankle, leg, and hip. Burdette has no memory of his fall or anything that happened immediately before or after it, including his conversation with Prejean. Prejean testified that Burdette's fall was the result of "user error," rather than any equipment malfunction.[7] He further noted that, while Burdette had the required equipment for climbing down, he did not have all of the necessary equipment for controlled descent.

After the accident, Burdette filed a claim for workers' compensation related to the injuries that he sustained. A hearing was then held before an ALJ, and after reviewing post-hearing briefs from the parties, the ALJ denied Burdette's claim for benefits. Specifically, the ALJ found that Burdette was barred from recovery because he engaged in "willful misconduct" within the meaning of OCGA § 34-9-17 (a),[8]

---

[7] According to Prejean, Burdette descended the tower using the "wrong tag line" instead of using the "load line," which is a thicker type of rope and is specifically made for controlled descent.

[8] *See* OCGA § 34-9-17 (a) ("No compensation shall be allowed for an injury or death due to the employee's willful misconduct, including intentionally self-inflicted injury, or growing out of his or her attempt to injure another, or for the

4

when he defied his supervisor's instruction to climb down the tower instead of using controlled descent. Burdette appealed the ALJ's award to the Board, and the Board affirmed and adopted the ALJ's findings. On October 4, 2014, Burdette filed a notice of appeal in the superior court, but that court never scheduled a hearing or issued a ruling on the matter. As a result, the Board's decision to deny Burdette benefits was affirmed by operation of law 60 days after it was docketed in the superior court.[9] Thereafter, we granted Burdette's application for discretionary appeal. This appeal follows.

1. As a preliminary matter, although Chandler does not develop any legal arguments to support this contention, it suggests in passing (and argued more fully below) that the superior court lacked jurisdiction over this case because Burdette filed his appeal from the Board's decision in the wrong county. In relevant part, OCGA § 34-9-105 provides that "if the injury occurred outside the state," either party to a workers' compensation dispute may appeal to "the superior court of the county in

---

willful failure or refusal to use a safety appliance or perform a duty required by statute.").

[9] *See* OCGA § 34-9-105 (b) (providing that "if the court does not hear the case within 60 days of the date of docketing in the superior court, the decision of the board shall be considered affirmed by operation of law . . .").

which the original hearing was held" within 20 days of the Board's final order or judgment.[10]

Here, it is undisputed that Burdette was injured in Texas, and that he did not appeal the Board's decision to the superior court in the same county where the original hearing before the ALJ was held. Nevertheless, in *Fowler v. Aetna Casualty & Surety Company*,[11] this Court overruled a line of cases holding that a superior court lacks subject-matter jurisdiction over appeals from workers' compensation awards that are filed in the wrong venue,[12] noting that the restrictive rule expressed in those cases would thwart the compensatory purpose of the Workers' Compensation Act.[13] Thus, we held in *Fowler* that a superior court has subject-matter jurisdiction over an appeal from a workers' compensation award even if it was filed in the wrong county.[14] Based on the foregoing, to the extent that Chandler argues the superior court

---

[10] OCGA § 34-9-105 (b).

[11] 159 Ga. App. 190 (283 SE2d 69) (1981).

[12] *See id.* at 193-94 (3).

[13] *See id.* at 193 (3).

[14] *See id.* at 193-94 (3); *see also Keramidas v. Dep't of Human Res.*, 147 Ga. App. 820, 822 (2) (250 SE2d 560) (1978) ("Jurisdiction of the subject-matter does not mean simply jurisdiction of the particular case then occupying the attention of the court, but jurisdiction of the *class of cases* to which that particular case belongs."

lacked subject-matter jurisdiction over Burdette's appeal because it was not filed in the proper county, we reject that contention.

2. Turning to the merits of this appeal, Burdette first argues that the ALJ and the Board erred in finding that his workers' compensation claim was barred because his injury resulted from his own "willful misconduct." We agree.

At the outset, we note that whether or not an employee is guilty of willful misconduct, or is guilty of willful refusal to perform a duty imposed on that employee by statute, are "questions of fact for the Board of Workers' Compensation, and the findings of the Board upon these questions are final, and will not be disturbed where there is evidence to support them."[15] With this guiding principle in mind, we turn now to Burdette's specific claim.

OCGA § 34-9-17 (a) provides that

[n]o compensation shall be allowed for an injury or death due to the employee's willful misconduct, including intentionally self-inflicted injury, or growing out of his or her attempt to injure another, or for the

(emphasis supplied) (punctuation omitted)).

[15] *Roy v. Norman*, 261 Ga. 303, 304 (404 SE2d 117) (1991) (emphasis omitted) (punctuation omitted); *see also Steed v. Liberty Mut. Ins. Co.*, 157 Ga. App. 273, 273 (1) (277 SE2d 278) (1981).

willful failure or refusal to use a safety appliance or perform a duty required by statute.

"Willful misconduct" is an affirmative defense[16] that the employer must prove by a preponderance of the evidence.[17] And although OCGA § 34-9-17 does not define "willful misconduct," the Supreme Court of Georgia has explained:

> Mere violation of rules, when not willful or intentional, is not willful misconduct, within the meaning of the laws upon the subject of workmen's compensation. There must be something more than thoughtlessness, heedlessness, or inadvertence in violating a rule or order of the employer, to constitute willful misconduct. There must be a willful breach of the rule or order. The mere violation of rules, when not willful or intentional, is not 'willful misconduct.' If the workman is acting within the scope of his employment, mere disregard of a rule or order does not become such misconduct, unless the disobedience be in fact willful or deliberate, and not a mere thoughtless act, done on the spur of the moment.[18]

---

[16] *See Cornell-Young (Macon Pre-Stressed Concrete Co.) v. Minter*, 168 Ga. App. 325, 327 (1) (309 SE2d 159) (1983).

[17] *Commc'ns, Inc. v. Cannon*, 174 Ga. App. 820, 820 (331 SE2d 112) (1985); *Borden Co. v. Dollar*, 96 Ga. App. 489, 490-91 (100 SE2d 607) (1957).

[18] *Aetna Life Ins. Co. v. Carroll*, 169 Ga. 333, 342 (1) (150 SE 208) (1929).

Our Supreme Court has further explained that willful misconduct "involves conduct of a *quasi criminal nature*, the intentional doing of something, either with the knowledge that it is likely to result in serious injury, or with a wanton and reckless disregard of its probable consequences."[19] Indeed, the general rule is that "mere violations of instructions, orders, rules, ordinances, and statutes, and the doing of hazardous acts where the danger is obvious, do not, without more, as a matter of law, constitute [willful] misconduct."[20]

On appeal, Burdette relies on *Wilbro v. Mossman*[21] to support his contention that his disobedience of a work rule—*i.e.*, using controlled descent instead of climbing down the cell tower—does not constitute willful misconduct as a matter of law. In *Wilbro*, a store clerk fell from a shelf on which she was standing to restock merchandise on the "highest shelf," and she injured her head and back.[22] Although the clerk had been using a stepladder, the top shelf could not be reached with the ladder.[23]

---

[19] *Id.* at 333 (1) (emphasis supplied); *accord Roy*, 261 Ga. at 304.

[20] *Roy*, 261 Ga. at 304; *accord Cannon*, 174 Ga. App. at 820.

[21] 207 Ga. App. 387 (427 SE2d 857) (1993).

[22] *See id.*

[23] *See id.*

9

And there was evidence that the clerk's supervisor had instructed her and her co-worker not to restock shelves that they could not reach with the stepladder and not to stand on the shelves.[24] Additionally, the co-worker reminded the clerk of the supervisor's instruction when she was climbing on the shelves, but the clerk said "it was okay and did not come down."[25] When the store clerk subsequently sought workers' compensation benefits, the store asserted the affirmative defense that recovery was barred by the clerk's willful misconduct.[26] But relying on the Supreme Court precedent set forth above, we held that the employee's conduct "cannot constitute willful misconduct as a matter of law since the conduct was at most a violation of instructions and/or the doing of a hazardous act in which the danger was obvious, but was not conduct that was criminal or quasi-criminal in nature."[27]

We see no meaningful distinction between *Wilbro* and the case *sub judice.* Here, like the clerk in *Wilbro,* Burdette intentionally violated a work rule and his supervisor and top hand's explicit instructions to climb down the cell tower, rather

---

[24] *See id.* at 388.

[25] *See id.*

[26] *See id.* at 390 (1).

[27] *Id*.

10

than using controlled descent. To be sure, Burdette engaged in "a hazardous act in which the danger was obvious," as he lacked some of the necessary equipment for controlled descent and failed to use the "tag line" or "rope" that was thick enough to support him.[28] But importantly, as in *Wilbro*, his conduct was not of a "quasi criminal nature," involving "the intentional doing of something, either with the knowledge that it is *likely* to result in serious injury, or with a wanton and reckless disregard of its *probable* consequences."[29] Indeed, Burdette and other cell-tower technicians had successfully used controlled descents in the past to descend cell towers,[30] and Chandler even required its technicians to learn controlled descent because it is necessary in certain circumstances for rescue purposes. Most certainly, Chandler would not require its technicians to train in and use controlled descent to rescue

---

[28] Although Prejean informed Burdette that they did not have a "safety rope" for him to hold, it is unclear whether Burdette was *aware* that he lacked necessary equipment or that he used the wrong tag line.

[29] *Carroll*, 169 Ga. at 342 (1) (emphasis supplied; *accord Wilbro*, 207 Ga. App. at 390 (1); *Roy*, 261 Ga. at 304; *Cannon*, 174 Ga. App. at 821.

[30] A former Chandler employee, who had worked with Burdette as the "crew chief," testified that they had climbed together, and Burdette had done controlled descents with him. He further testified that anyone who climbed towers with him, including Burdette, had been taught how to do a controlled descent.

11

someone if serious injury was the *likely* or *probable* result of such conduct.[31] In light of the foregoing, Chandler has not met its burden of showing that Burdette's use of controlled descent was willful misconduct within the meaning of OCGA § 34-9-105 (a).[32]

The Board, in adopting the ALJ's award, found that Burdette's workers' compensation claim was barred by OCGA § 34-9-17 (a) because he "willfully disobeyed instructions given him by the lead tower hand when [Burdette] told him he was going to [rappel] down, and ignored the lead tower hand's repeated instructions to climb down." But again, the mere violation of a work rule or instructions and

[31] *See supra* footnote 29.

[32] Some judges of this Court may question whether our Supreme Court's interpretation of OCGA § 34-9-17 (a)'s predecessor statute in *Aetna Life Ins. Co. v. Carroll*—which was substantively indistinguishable from the current one—is consistent with the plain meaning of that statutory provision's text. Nevertheless, until such time as our Supreme Court reconsiders its holding in that case, we are bound by it. *See* Ga. Const., art. VI, § VI, ¶ VI (1983) ("The decisions of the Supreme Court shall bind all other courts as precedents."); *State v. Smith,* 308 Ga. App. 345, 352 (1) (707 SE2d 560) (2011) ("[T]he doctrine of stare decisis prohibits this Court from ignoring the valid precedent of a higher court."); *State v. Jackson,* 287 Ga. 646, 658 (5) (697 SE2d 757) (2010) ("Stare decisis is an important principle that promotes the rule of law . . . ."); *see also* Kurt T. Lash, *Originalism, Popular Sovereignty, and Reverse Stare Decisis,* 93 Va. L. Rev. 1437, 1454 (2007) (noting that "[v]ertical stare decisis refers to the binding effect of precedent on lower courts," and that "[s]erious rule of law costs would follow if lower courts were free to ignore precedent established by a higher court of appeal").

12

engaging in a hazardous act in which the danger is obvious is insufficient to constitute willful misconduct such as to bar recovery of benefits.[33] Under these particular circumstances, the Board's finding that Burdette's claim for workers' compensation benefits was barred by his own willful misconduct was unsupported by the evidence.[34]

---

[33] *See supra* footnote 20.

[34] *See Wilbro*, 207 Ga. App. at 387-88, 390 (1) (holding that an employee, who was injured after falling from shelves that she was expressly instructed not to step on, did not commit willful misconduct such that she was barred from recovering workers' compensation benefits, as her conduct was not criminal or quasi criminal in nature); *see also Lumbermens Mut. Cas. Co. v. Amerine*, 139 Ga. App. 702, 703-04 (229 SE2d 516) (1976) (affirming the ALJ's determination that a salesman, who was injured while doing "wheelies" on a bicycle in a warehouse during the course of his work duties, engaged in hazardous conduct where the possibility of danger was obvious, but such conduct did not constitute willful misconduct such as to bar recovery); *City of Atlanta v. Madaris*, 130 Ga. App. 783, 783, 785 (2) (204 SE2d 439) (1974) (holding that graveyard watchman's "unwise" use of a loaded firearm to hammer an engine part on the vehicle he used to patrol the graveyard, which resulted in his death, did not constitute willful misconduct such as to bar his widow's recover of workers' compensation benefits). *C. f. Cannon*, 174 Ga. App. at 822 (holding that a widow of an employee who was killed in an accident when he had a blood alcohol level of .23 percent and was driving the wrong way down the interstate was barred from receiving workers' compensation benefits because his death was due to his own willful misconduct); *Liberty Mut. Ins. Co. v. Bray*, 136 Ga. App. 587, 587-88, 590 (222 SE2d 70) (1975) (holding that an employee who was injured while *illegally* "jaywalking" across a highway was barred from receiving workers compensation benefits due to his own willful misconduct).

13

3. Burdette also contends that the ALJ erred in making several evidentiary rulings. However, given our holding in Division 2 *supra*, we need not address these arguments.

For all of the foregoing reasons, we reverse the Board's denial of workers' compensation benefits to Burdette.

*Judgment reversed. McFadden, J., concurs*, *and Ellington, P. J., concurs in judgement only.*